OPINION OF THE COURT
Nanette Dembitz, J.
The question in the instant paternity suit is whether a father should be liable for the support of his out-of-wedlock child, even though the mother accomplished her plan to have a baby by deliberately and falsely representing to him that she was using contraception.
Petitioner mother contends that the evidence as to her purposeful deceit, even if credited, is irrelevent to a father’s statutory duty to support his progeny. Respondent father, on the other hand, emphasizes that the Constitution as interpreted by the United States Supreme Court guarantees to men as well as to women the freedom to choose whether or not to beget a child. He therefore argues that a support order burdening him with an attribute of parenthood despite petitioner’s interference with his right to avoid procreation, would violate the Constitution.
*979 Research has disclosed no New York case involving the question at bar, and no out-of-State decision except one by an intermediate California court.[1] While that court upheld a mother’s contention that her alleged deception of the father was irrelevant, the decision ignored both the law of fraud and deceit and the constitutional issue. Both common-law and constitutional principle must in this court’s opinion influence the construction of the paternity statute, and they require curtailment of respondent’s support obligation because of petitioner’s purposeful misrepresentation. However, the court must, for reasons concerning the welfare of the child, reject respondent’s argument that his duty of support can be entirely eliminated.
Before discussing the legal issues the findings as to respondent’s paternity and petitioner’s intentional deceit will be summarized.
FINDINGS AS TO RESPONDENT’S PATERNITY AND PETITIONER’S DECEIT
Respondent’s paternity was clearly and convincingly established by credible and uncontroverted evidence. Petitioner, who is an unmarried airline flight attendant based in New York City, lived with respondent in 1973 through 1974 in Switzerland and thereafter saw him approximately once a year when he came from Europe to New York. Besides her testimony that she had sexual intercourse only with respondent during the period for conception of the child born on March 15, 1980, the human leukocyte antigen (HLA) blood-matching test showed the high probability of respondent’s paternity.[2]
As to petitioner’s deception, respondent testified that on the crucial night, which followed a long separation, he asked petitioner before they had sexual intercourse what she was doing in regard to contraception, and she replied *980 that she was “on the pill”. Petitioner conceded in her testimony that she was not using birth control pills or any other contraception, and that her sexual intercourse with respondent occurred during the most fertile phase of her monthly reproductive cycle. However, she denied recollection of any question by respondent about contraception.
A witness who under the circumstances of his appearance seemed completely credible,[3] testified that he had broken off a sexual relationship with petitioner approximately two months before the date of the child’s conception, because she told him she was no longer taking birth control pills and wanted to have a baby. When he said he was unwilling to father her child, she replied, according to his testimony, that she would have a child with S., the respondent, whether he wanted her to or not, and that she would refrain from telling him she was off of birth control pills. In the context of this testimony as well as the total testimony as to petitioner and respondent’s relationship and conversations, the evidence is entirely clear and convincing that petitioner falsely told respondent she was “on the pill” and thereby purposely deceived him with regard to contraception; the court so finds.
LEGAL CONSEQUENCES OF PETITIONER’S DECEIT
A. Exceptions to Absolute Rule of Parental Responsibility
As petitioner argues, the paternity statute, like provisions for support of legitimate children, states a father’s duty of support in terms of an unequivocal obligation (Family Ct Act, § 545). Nevertheless, respondent is correct in his contention that the courts have grafted some exceptions onto the statutes; and the question at bar is whether a deception such as petitioner’s should, like a few other circumstances unmentioned by the legislative draftsmen, ground an exception. The statutory silence on this point is unpersuasive either way. At the time the paternity statute was written, “modern methods of contraception”[4] were unknown; their free discussion was far in the future; conduct like petitioner’s could hardly have been visualized. *981 And the law of support has accommodated itself to achieve equitable results in the light of scientific progress.[5]
Pertinent to respondent’s claim to exemption from the support obligation are the rulings suspending a father’s duty of payment when the custodial mother wrongfully deprives him of visitation with the child.[6] There the courts, recognizing the practical benefit to the custodial mother of a child support order against the father, apply common-law precepts as to reciprocal rights and duties between the parties. Those precepts and the underlying principle that the father’s statutory support obligation can be drastically affected by the custodial mother, are also reflected in the landmark decision in Matter of Boden v Boden (42 NY2d 210, 213), emphasizing the effect of a separation agreement on the father’s basic duty to the child.[7]
Common-law concepts as to fraud and deceit likewise warrant weight, in this court’s opinion, in determining support obligations. These standards, embodying enduring ethical values, apply throughout the Domestic Relations Law. Thus, despite the sanctity of an adoption in establishing a parental relationship and obligation, an adoption has' always been voidable for fraud.[8]
The chief ingredient of fraud and deceit was here clearly and convincingly established by petitioner’s premeditated, deliberate and intentional misrepresentation for the purpose of influencing respondent to act for her benefit.[9] It is *982 true that one factor in a suit for fraud action in reliance on the misrepresentation — has not been convincingly proved. Though petitioner probably estimated respondent correctly when she decided to deceive him to gain her goal, he apparently realized the possible ineffectiveness of birth control pills; and it cannot be concluded with certainty that her misrepresentation was the “but-for” cause of respondent’s risking sexual intercourse with her without himself using contraception. However, the requirement of proximate causation seems pertinent only to the justification for damages for a deception; it is inapposite in considering the relevant question here: the law’s accepted standards for right conduct between individuals.
Petitioner’s planned and intentional deceit bars her, in this court’s opinion, from financial benefit at respondent’s expense. The usual rule in apportioning support, that parents must make equivalent financial sacrifices to support their child,[10] is therefore held inapplicable in the instant case (see point C below as to appropriate standard for support order). Petitioner’s wrong towards respondent precludes her transfer to him of her financial burden for the child she alone chose to have. Consistent with the judicial function of following an equitable approach in support cases,[11] this court must consider “the inequitable conduct of one who invokes its relief” (see McGrath v Hilding, 41 NY2d 625, 627). The question suggested by the attorneys as to whether this ruling would apply to a married couple need not be answered here; but it may be noted that marriage is ordinarily deemed to represent a willingness to procreate. (See Aghnides v Aghnides, 308 NY 530, 533.)[12]
*983 B. Constitutional Impact of Petitioner’s Deceit
In construing support statutes, the courts must be alert not only to common-law but to constitutional principles. (See Matter of Carter v Carter, 58 AD2d 438, interpreting Family Court Act’s support provisions to eliminate gender discrimination; followed in Tessler v Siegel, 59 AD2d 846.)
Constitutional doctrine as to procreative freedom has developed mainly in the context of women’s rights. There can be no question, however, that the Fourteenth Amendment to the Constitution guarantees to a man equally with a woman freedom of choice to use contraception and avoid procreation. (See Eisenstadt v Baird, 405 US 438, 448-449, 453; Carey v Population Servs. Int., 431 US 678, 684-691.) It is likewise established constitutional doctrine that “[T]he prohibitions of the Fourteenth Amendment *** includes action of state courts”, and that a court order sanctioning a private individual’s act violates the Constitution whenever official action having by itself a similar impact would be unconstitutional (see Shelley v Kraemer, 334 US 1, 18). And see Brown v Davis (48 Ohio St 2d 41, 46), holding that the court would impermissibly infringe on a constitutional right if it denied liability for medical malpractice regarding a patient’s “choice not to procreate” (see, also, Rivera v State of New York, 94 Misc 2d 157, 162).
Under the Shelley principle the question is whether petitioner’s deception interfered with respondent’s right of free choice regarding procreation to such an extent that an order in petitioner’s favor would be unconstitutional. Here there was no outright barrier to respondent’s resort to contraception or to abstinence. Nor would a court order in petitioner’s favor impinge as crucially on constitutional rights as the order sought in Shelley; there denial of relief deprived the private act — a restrictive covenant — of retrospective as well as prospective effect. Nevertheless, petitioner did bar respondent from full and true freedom of choice by deceiving him as to the procreative facts,[13] and *984 her intention undoubtedly was to deprive him of a free choice.[14] “[R]estrictions * * * [that] could not be squared with the requirements of the Fourteenth Amendment if imposed by state statute” cannot be implemented by court order (Shelley, 334 US, at p 11); and a law with the purpose and the likely effect of curtailing free choice as to procreation, would assuredly be unconstitutional. Thus, Shelley is pertinent, for an order in petitioner’s favor, enforceable by the court’s contempt power (Family Ct Act, § 454), would condone, encourage, and put the “imprimatur of the State” upon interference with reproductive choice (see 334 US, at p 20). Since a support order benefiting petitioner would raise constitutional doubt under the Fourteenth Amendment, it should be denied.
C. Separate Interests of Petitioner and Child
Unquestionably, as petitioner argues, a paternity case is “chiefly concerned with the welfare of the child” (Schaschlo v Taishoff, 2 NY2d 408, 411); and denial of financial benefit to petitioner mother in accordance with the above conclusion, must be accomplished without detriment to the child.
Respondent argues that his complete exemption from financial responsibility would not harm the child because petitioner’s income would, if necessary, be supplemented by public assistance. It is true, as respondent contends, that an infringement of constitutional rights cannot be justified merely by the State’s interest in saving money (see Goldberg v Kelly, 397 US 254, 265-266). That principle however is inapposite here because relegation of the child to public assistance would affect a more fundamental State interest than the fiscal.
The ancient and enduring interest here at stake is parental support for helpless children — the sharing of parental means with an infant — with State care only as a last resort. Research reveals no prior consideration of parental obligation from a constitutional standpoint; but clearly, the duty of support fits into the legal framework as a *985 reciprocal of the fundamental constitutional right to beget and raise children.[15] Public concern with the child support obligation thus corresponds in intensity with the major significance of that constitutional right in a democratic, nonstatist society. Accordingly, this court views enforcement of the parental support duty as a compelling State interest that justifies diminution of the right to free procreative choice.
In defining that duty the Legislature and the courts have established the standard of fair and reasonable parental support in accordance with the parent’s means, and this criterion must under the Constitution apply to an illegitimate child equally with the legitimate.[16] Thus the child herein cannot be relegated to a public assistance standard. However, since it is consistent with the support rulings in this State to give weight to petitioner’s deceit (point A above), it is in this court’s opinion constitutional to deny her application for child support[17] provided that the basic objective of satisfying the child’s fair and reasonable needs can nevertheless be met. Accordingly, under a reasonable and valid accommodation of principles, a support order will be entered against respondent only if petitioner’s means are insufficient to answer such needs.
Because need above a subsistence level is a flexible concept, standards of living must be considered. The child is entitled in this court’s opinion to no less a standard of living than his father’s,[18] because it indicates the likely level that the child would enjoy if he had been born into the still-prevalent circumstance of an intact family or a father willingly sharing his custody and care. However, the father’s standard would under this reasoning set a maximum as well as a minimum limit on his duty of child support, *986 even if his standard is more modest, as in this case it may be, than his means require.[19] A hearing is scheduled to determine whether the financial facts justify entry of a support order in accordance with this opinion.

. Stephen K. v Roni L., 105 Cal App 3d 640.

. An amendment authorizing reliance on the HLA test to prove paternity became effective March 1,1981; the blood-grouping test theretofore in use was only admissible to disprove paternity (see Matter of Jane L. v Rodney B., 108 Misc 2d 709). In the instant case an expert testified that over 150 factors in the bloods of petitioner, respondent, and the child were examined and that the “plausibility” of respondent’s paternity was .997.

. The witness, whom respondent subpoenaed with difficulty, testified after a finding of respondent’s paternity.

. Sorkin v Lee, 78 AD2d 180, app dsmd 53 NY2d 797.

. For example, it has never been suggested that a sperm donor other than the husband is liable for child support in an artificial insemination case; rather, a husband who consents to his wife’s insemination, has such obligation. (Matter of Anonymous, 74 Misc 2d 99; Anonymous v Anonymous, 41 Misc 2d 886; Gursky v Gursky, 39 Misc 2d 1083.)

. See, e.g., Borax v Borax, 4 NY2d 113, 116; Feuer v Feuer, 50 AD2d 772, 773; Abraham v Abraham, 44 AD2d 675, 676; Matter of Sawyer v Larkin, 37 AD2d 929, 930.

. For cases following Boden (supra), see, e.g., Matter of Gould v Hannan (44 NY2d 932). Prior to Boden emphasis was ordinarily placed on the principle that the separation agreement did not bind the children and that “the court is required to provide for their support and welfare as justice requires”. (Kulok v Kulok, 20 AD2d 568, 569; see, also, Brock v Brock, 4 AD2d 747; Kunker v Kunker, 230 App Div 641, 645.)

. See Matter of Lord, 28 AD2d 1203; Stevens v Halstead, 168 NYS 142, 144; Matter of Anonymous, 29 Misc 2d 580, 582. As to annulment of a marriage on grounds of fraud (frequently in past times based on a woman’s deception regarding her chastity), see Beard v Beard (238 NY 599); Anonymous v Anonymous (69 NY2d 155); Iati v Iati (151 Misc 591).

. See Channel Masters Corp. v Aluminum Ltd. Sales (4 NY2d 403, 406-407) for elements of fraud, and Simcuski v Saeli (44 NY2d 442, 451-452) for a deception *982 analogous to instant one in that it deterred the defrauded from self-help, See Frigitemp Corp. v Financial Dynamics Fund (524 F2d 275, 282) as to victim’s inability to investigate truth of the misrepresentation.

. See Tessler v Siegel (59 AD2d 846, 847): child support is allocated “evenhandedly” between the parents; Morrow v Morrow (62 AD2d 1142, 1143): child support order properly leaves the mother and father “with a comparable amount.of spendable income”.

. See Kay v Kay, 37 NY2d 632, 637; Matter of Hudis v Hudis, 64 AD2d 653.

. Petitioner also advanced the view espoused by some courts that public policy precludes inquiry as to whether a child was wanted or unwanted. (See Becker v Schwartz, 46 NY2d 401, 405-409, 414-415; cf. Rivera v State of New York, 94 Misc 2d 157, 162.) Such statements bear on the calculation of damages in actions for malpractice in performing services to prevent childbirth — the so-called “wrongful conception or wrongful life” cases — and are unpersuasive here.

. While the instant case obviously does not evoke the strictures of criminal procedure, pertinent here is the criminal-constitutional law doctrine that a genuinely free choice is defeated by ignorance, concealment, or deception. (See, e.g., McCarthy v United States, 394 US 459, 466.)

. See Mobile v Bolden (446 US 55, 62-64, 66-69), emphasizing the importance in constitutional doctrine of the actor’s intent to deprive, as distinguished from the mere effect of the act.

. See Cleveland Bd. of Educ. v LaFleur, 414 US 632, 640; Stanley v Illinois, 405 US 645, 651; Meyer v Nebraska, 262 US 390, 399.

. See Gomez v Perez, 409 US 535, 538. To the extent that section 513 of the Family Court Act indicates that the standard of support for an illegitimate child is more niggardly than that for the legitimate child, it must be deemed unconstitutional.

. See Smith v Organization of Foster Families (431 US 816, 846) as to effect on constitutional question of limitations on rights or interests under State law.

. See DeBrauwere v DeBrauwere (203 NY 460, 464, 465) where the court refers to a father’s duty to supply children with “reasonable amounts” for the “necessaries of life suitable to their condition” and “ ‘suitable clothing and maintenance according to his and their situation and condition in life’.” (Emphasis added.)

. While this formula downplays parental means, a father’s allocation of his income may be considered in formulating a support order — for example, his payments of debts in preference to bankruptcy. (See Harley v Harley, 49 AD2d 513; Norton v Norton, 41 AD2d 559, 560; Carole K v Arnold K, 85 Misc 2d 643, 646.)